UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| WILFRIDO SANDOVAL DELGADO,<br><br>               Petitioner,<br><br>     v.<br><br>VERANIA DIAZ MARQUEZ,<br><br>               Respondent. | Case No.  23-cv-05141-VKD<br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW** |

## I.    INTRODUCTION

Petitioner Wilfrido Sandoval Delgado filed this petition pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670 ("Hague Convention"),[1] against respondent Verania Diaz Marquez, seeking the return of their son, JASD, to Mexico.[2]  Dkt. No. 1.  Mr. Sandoval asserts that Ms. Diaz wrongfully removed JASD from his habitual residence in Mexico and that he is entitled to JASD's return pursuant to Article 3 of the Hague Convention.  *Id.*

In advance of trial, the parties agreed, and the Court found, that Mr. Sandoval has established the elements of his case for return of JASD under Article 3.  Specifically, the following facts are not disputed: (1) respondent Ms. Diaz removed JASD from Mexico on April 21, 2022; (2) Mexico was at that time JASD's habitual residence; (3) the removal was in violation of Mr. Sandoval's custody rights under Mexican law; and (4) Mr. Sandoval was actually

---

[1] In the United States, the Hague Convention is implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*

[2] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 8, 15.

United States District Court<br>Northern District of California

exercising his custody rights at the time of the removal.  *See* Dkt. No. 33 at 1

Ms. Diaz asserts two defenses to Mr. Sandoval's petition.  First, Ms. Diaz asserts that the Court should not order JASD's return to Mexico because Mr. Sandoval delayed in filing his petition and JASD is now settled in the United States, as provided in Article 12 of the Hague Convention.  To establish this defense, Ms. Diaz must prove that Mr. Sandoval failed to commence judicial proceedings for JASD's return within one year of his removal, and that JASD is now settled in his new environment.  *See* Hague Convention, Art. 12.  In advance of trial, the Court concluded as a matter of law that Mr. Sandoval filed his petition for return on October 6, 2023, and therefore did not commence these proceedings within one year of JASD's removal from Mexico, leaving only the question of whether JASD is settled in the United States.  Dkt. No. 33 at 2.

Second, Ms. Diaz asserts that the Court should not order JASD's return to Mexico because there is a grave risk that return would expose him to physical or psychological harm, as provided in Article 13(b) of the Hague Convention.  *See* Hague Convention, Art. 13(b).  The parties disagree about the facts pertaining to this defense, including whether Mr. Sandoval engaged in acts or threats of violence against Ms. Diaz.  *See* Dkt. No. 33 at 2-3.

Ms. Diaz's defenses were tried to the Court without a jury over three days, from January 31, 2024 to February 2, 2024.  Dkt. Nos. 38-40.  The Court heard testimony from the following witnesses:

1.  Verania Diaz Marquez (Respondent)

2.  Arturo Garcia Marquez (Respondent's uncle)

3.  Juana Ibeth Marquez Garcia (Respondent's mother)

4.  Wilfrido Sandoval Delgado (Petitioner)

All witnesses testified with the assistance of certified Spanish language interpreters.  *See* Dkt. Nos. 38-40.  The parties stipulated to the admission of certain exhibits in evidence.  Dkt. No. 36.  Additional exhibits were admitted during trial.  *See* Dkt. Nos. 38-1, 39-1, 40-1 (trial logs).  At the conclusion of the trial, the Court allowed, but did not require, the parties to file final proposed

United States District Court
Northern District of California

2

United States District Court
Northern District of California

findings of fact and conclusions of law.[3]

Having considered the evidence presented, the Court now makes the following findings of fact and conclusions of law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.  As explained in further detail below, the Court finds that Ms. Diaz has established both of her defenses under Articles 12 and 13(b) of the Hague Convention.

## II.    FINDINGS OF FACT[4]

### A.    JASD's Habitual Residence in Mexico

1.    Mr. Sandoval and Ms. Diaz are both Mexican citizens.  At all times relevant to this action, Mr. Sandoval resided in Mexico.  Until April 21, 2022, Ms. Diaz also resided in Mexico. Dkt. No. 29 at 3; Dkt. No. 38; Ex. 318 at 2.

2.    Mr. Sandoval and Ms. Diaz began a romantic relationship in May of 2017, when she was 17 years old and he was 34 years old.  Dkt. No. 29 at 3; Dkt. No. 38; Ex. 48 at 4; Ex. 308 at 14.

3.    Ms. Diaz and Mr. Sandoval began living together in August of 2017.  Dkt. No. 38; Ex. 308 at 14.  They never married.  Dkt. No. 29 at 3.

4.    Ms. Diaz gave birth to JASD in May of 2018.  Ms. Diaz and Mr. Sandoval are JASD's biological parents.  Dkt. No. 29 at 3.

5.    Mr. Sandoval and Ms. Diaz temporarily separated on several occasions.  They ended their romantic relationship and permanently separated in March of 2021.  At that point, Mr. Sandoval moved out of the house he shared with Ms. Diaz and JASD, and Ms. Diaz continued to reside there with JASD.  Mr. Sandoval saw JASD frequently after the separation, but Ms. Diaz was always present when Mr. Sandoval and JASD were together.  Dkt. No. 38.

### B.    Ms. Diaz's and JASD's Residence in California

6.    On April 21, 2022, Ms. Diaz traveled to Watsonville, California with her son

---

[3] Respondent filed final proposed findings of fact and conclusions of law (Dkt. No. 43); petitioner did not.

[4] No certified transcript of the trial has been requested or prepared.  In this order, the Court cites testimony by referring to the minute entry for the date it was received.

1    JASD.  She and JASD began living at the home of Ms. Diaz's uncle, Arturo Garcia Marquez.

2    Dkt. No. 29 at 3; Dkt. No. 38; Dkt. No. 39; Ex. 308 at 16, Ex. 318 at 12.

3           7.      After arriving in California, Ms. Diaz placed JASD, who was then nearly four years

4    old, in a Head Start program run by Encompass Community Services.  JASD graduated from the

5    Head Start program in May of 2023.  Dkt. No. 38; Ex. 320 (Head Start certificate).

6           8.      Ms. Diaz then enrolled JASD in a bilingual kindergarten program in the Pajaro

7    Valley Unified School District for the 2023-2024 school year.  A report card from the first quarter

8    of the school year indicates that JASD is doing well academically and has a nearly perfect

9    attendance record.  In November 2023, JASD received a certificate from his school for academic

10   achievement in writing.  Dkt. No. 38; Ex. 321 (report card); Ex. 322 (school ID); Ex. 326

11   (certificate of achievement).

12          9.      JASD has taken swim lessons at a local swim school.  Dkt. No. 38; Ex. 325.  He

13   has made friends with other children in the community.  JASD does not have any friends in

14   Mexico.  Occasionally, he communicates by telephone with his grandparents in Mexico.  Dkt. No.

15   38.

16          10.     JASD received a physical examination prior to starting kindergarten, including a

17   nutritional assessment, vision screening, hearing examination, and dental assessment.  He is in

18   good physical health and has received all of his required immunizations.  Dkt. No. 38; Ex. 328;

19   Ex. 329.  JASD has received therapy from Santa Cruz County Behavioral Health Services,

20   although the nature of that therapy is not part of the record.[5]  Dkt. No. 39.

21          11.     In December of 2022, Ms. Diaz filed an application for asylum in the United States,

22   asserting fear of violence from Mr. Sandoval if she were to return to Mexico.  Dkt. No. 38; Ex.

23   318.  JASD is included as a derivative beneficiary on Ms. Diaz's application.  Ex. 318 at 2.  Ms.

24   Diaz's asylum application remains pending.  Ms. Diaz has permission to work in the United States

25   while her application is pending.  Dkt. No. 38; Ex. 319.

26

27   _____

28   [5] No party asked the Court to order an independent forensic psychological exam of JASD.
     Respondent did not call JASD's therapist to testify at trial.

United States District Court
Northern District of California

12. After living with Ms. Diaz's uncle for approximately one year, Ms. Diaz and JASD moved into a small, one bedroom house that they share with Ms. Diaz's brother. The house has a play area for JASD. Dkt. No. 38.

13. Ms. Diaz has been employed full-time in Watsonville since June of 2022. She earns enough money to be support herself and JASD. She does not receive financial support from Mr. Sandoval. Dkt. No. 38.

14. Both Ms. Diaz and JASD have social security numbers. Dkt. No 38.

15. Ms. Diaz and JASD have a large extended family in the Watsonville area. Ms. Diaz and JASD often spend time with family, including at family gatherings, school events, and religious services. Dkt. No. 38; Dkt. No. 39; *see also* Ex. 325 (photographs of family activities).

**C.    Mr. Sandoval's Alleged Abuse of Ms. Diaz**

16. At trial, Ms. Diaz testified that Mr. Sandoval physically and emotionally abused her on many occasions during their relationship and after their separation. Mr. Sandoval testified that he pushed Ms. Diaz during an argument on one occasion, but denied her other allegations of abuse. The Court had an opportunity to assess Ms. Diaz's and Mr. Sandoval's credibility when each testified at trial and to evaluate other evidence in the record related to the alleged abuse. With respect to these allegations, the Court finds Ms. Diaz's testimony generally credible, and finds Mr. Sandoval's testimony generally not credible. The Court concludes that the following incidents of physical and emotional abuse occurred:

17. In September of 2017, Mr. Sandoval called Ms. Diaz a "whore" because he believed she was flirting with one of his cousins at a family event. Mr. Sandoval was intoxicated at the time. Dkt. No. 38; Ex. 308 at 14-15.

18. On December 24, 2017, while Ms. Diaz was pregnant with JASD, she and Mr. Sandoval had an argument at the house where they were living. Mr. Sandoval again insulted Ms. Diaz, threw her against a wall, and tried to hit her. Mr. Sandoval's sister was present during this incident and prevented Mr. Sandoval from striking Ms. Diaz. Dkt. No. 38; Ex. 308 at 15.

19. At the time Ms. Diaz was due to give birth to JASD in May 2018, Mr. Sandoval warned her that she should not have a caesarean section because he did not want to pay for that

procedure.  JASD was born by caesarean section.  Dkt. No. 38; Ex. 308 at 15.

20.     In January of 2019, Ms. Diaz and Mr. Sandoval had another argument.  Mr. Sandoval again insulted Ms. Diaz and took her cell phone from her.  Mr. Sandoval told Ms. Diaz he was going to leave with JASD, who was then about nine months old.  Ms. Diaz asked for help from a neighbor, who called the police.  Police officers arrived and prevented Mr. Sandoval from leaving with JASD.  Dkt. No 38; Ex. 308 at 15.

21.     On September 1, 2020, Mr. Sandoval came home very intoxicated.  He threatened to kill himself.  Mr. Sandoval put his neck through the strap of purse that Ms. Diaz had left hanging on the railing of a staircase.  Dkt. No. 38; Ex. 308 at 15.  Ms. Diaz did not regard Mr. Sandoval's behavior as a genuine effort to actually commit suicide.  Ex. 308 at 15.  At trial, Ms. Diaz testified that Mr. Sandoval also threatened to kill her and JASD, although it is not clear from her testimony that he made these threats on September 1, 2020.  Dkt. No. 38; *but see* Ex. 308 at 15 (stating that on September 1, 2020, "[Mr. Sandoval] was threatening that he was tired of suffering and that he would rather kill me and his son.").  JASD was in the same room as Ms. Diaz and Mr. Sandoval when Mr. Sandoval threatened to kill himself.  Dkt. No. 38; Ex. 308 at 15.

22.     In December of 2021, several months after Ms. Diaz and Mr. Sandoval ended their relationship and had stopped living together, Ms. Diaz traveled to Watsonville, California with JASD to visit her grandmother, who was ill, and to visit other family members in the area.  When she was ready to return to Mexico, she and Mr. Sandoval agreed that Mr. Sandoval would drive to Watsonville to pick up Ms. Diaz and JASD.  Dkt. No. 38.

23.     On April 4, 2022, Mr. Sandoval, Ms. Diaz and JASD began a multi-day drive from Watsonville to Aguascalientes.[6]  Ms. Diaz made the trip voluntarily and did not believe that JASD would be in danger if she and her son returned to Mexico with Mr. Sandoval.  Dkt. No. 38.  Mr. Sandoval testified that he and Ms. Diaz wished to reconcile and that he expected that she and JASD would live with him in Mexico.  Dkt. No. 39.  However, Ms. Diaz had no such wish and she did not agree to live together with Mr. Sandoval and their son.  Dkt. No. 38.

---

[6] Aguascalientes is a city in the state of Aguascalientes, Mexico.

United States District Court
Northern District of California

United States District Court
Northern District of California

24.     Mr. Sandoval and Ms. Diaz arrived in Aguascalientes on April 6, 2022.  Shortly thereafter, they visited Mr. Sandoval's parents at their house in Ecatepec de Morelos.[7]  Dkt. No. 38; Ex. 48 at 4.  Mr. Sandoval's parents invited Mr. Sandoval, Ms. Diaz, and JASD to join them on a trip they were about to take to the beach in Acapulco.[8]  Ms. Diaz agreed that she and JASD would join Mr. Sandoval and his parents on this trip.  Dkt. No. 38.

25.     On the morning of April 9, 2022, Mr. Sandoval, Ms. Diaz, and JASD were staying at Mr. Sandoval's parents' house.  Mr. Sandoval left the house to go to his office, which was down the street from the house.  While he was gone, Ms. Diaz took a shower and let JASD play with her cell phone.  While Ms. Diaz was still in the shower, Mr. Sandoval returned to the house.  He took Ms. Diaz's cell phone from JASD and saw messages from a man she had met in the United States. Dkt. No. 38; Dkt. No. 39; Ex. 48 at 4-5; Ex. 308 at 16; Ex. 318 at 5.

26.     Mr. Sandoval left the house, taking Ms. Diaz's cell phone with him.  Dkt. No. 39. Once Ms. Diaz realized what had happened, she left the house with JASD and walked down the street to Mr. Sandoval's office to find him and retrieve her cell phone.  Surveillance video of the outside of the office shows Mr. Sandoval's truck parked next to the door.  The video shows Ms. Diaz, holding JASD's hand, speaking with Mr. Sandoval's cousin outside the office, then walking back with JASD in the direction of the house.  Dkt. No. 38; Ex. 4.  The video bears a date stamp of April 9, 2022.  The video begins at 10:21 a.m. and ends at 10:23 a.m.  Ex. 4.

27.     Mr. Sandoval returned to his parents' house and gave Ms. Diaz her cell phone. Dkt. No. 39.  He began beating Ms. Diaz and called her a "whore."  In his parents' living room with JASD present, Mr. Sandoval threw Ms. Diaz down on an armchair or couch and tried to strangle her.  Dkt. No. 38; Ex. 48 at 5; Ex. 308 at 16; Ex. 318 at 15.  Mr. Sandoval then attempted to leave the house with JASD.  Ms. Diaz tried to stop him.  She screamed at Mr. Sandoval to release JASD and used her hands and body to try to take her son from him.  While holding JASD, Mr. Sandoval hit Ms. Diaz with closed fists and kicked her.  Mr. Sandoval said to JASD "your

---

[7] Ecatepec de Morelos is a city in the State of Mexico, Mexico.

[8] Acapulco is a city in the state of Guerrero, Mexico.

mom is a whore and you are never going to see her again." Mr. Sandoval then left the house with JASD. Dkt. No. 38; Dkt. No. 39; Ex. 48 at 5; Ex. 308 at 16.

28. Shortly thereafter, Ms. Diaz went back to Mr. Sandoval's office to look for Mr. Sandoval's cousin. Dkt. No. 38. Surveillance video of the outside of the office shows Mr. Sandoval's truck parked next to the door. It also shows Ms. Diaz, alone, outside of the office. She appears distraught. At first, she pounds on the door of the office with her hands. Then she takes a metal object resembling a tire iron from the bed of truck and uses it to beat on the office's door and grilled windows. She appears to be yelling. Ms. Diaz briefly walks away and then returns and strikes the back and sides of the truck with the metal object. Dkt. No. 38; Ex. 5. She then walks back in the direction of Mr. Sandoval's parents' house alone. The video bears a date stamp of April 9, 2022. The video begins at 10:40 a.m. and ends at 10:43 a.m. Ex. 5.

29. After returning to Mr. Sandoval's parents' house, Ms. Diaz called the police. The police arrived within ten to fifteen minutes. Ms. Diaz told the police officers that she had been beaten and that her son had been taken away. However, when Ms. Diaz told the officers Mr. Sandoval's name and showed them a photograph of his vehicle, they told Ms. Diaz that they could not help her. The police officers did not take a statement from Ms. Diaz and left after five to seven minutes. Dkt. No. 38; Ex. 48 at 5; Ex. 308 at 16; Ex. 318 at 5.

30. Ms. Diaz's account of Mr. Sandoval's behavior is corroborated by testimony from her uncle, Arturo Garcia Marquez. Mr. Marquez lives in Watsonville, California, but on April 9, 2022, he was in the state of Nayarit, Mexico. That morning, approximately one hour after Mr. Sandoval left his parent's house with JASD, Mr. Marquez received a call from Mr. Sandoval. Mr. Marquez testified that Mr. Sandoval told him there "had been violence" including "blows and kicks" and that Mr. Sandoval was sorry. Mr. Sandoval also told Mr. Marquez that JASD was with him. Dkt. No. 39. At trial, Mr. Sandoval acknowledged calling Mr. Marquez on the morning of April 9, 2022 because he "thought it was the prudent thing to do," but he denied telling Mr. Marquez he was sorry. Dkt. No. 40. The Court finds Mr. Marquez's testimony credible.

31. Ms. Diaz's account of Mr. Sandoval's behavior is also corroborated by physical evidence, including two sets of photographs documenting injuries to Ms. Diaz's knee, thigh, and

8

neck. The first set of photographs were taken by Ms. Diaz's aunt on April 12, 2022, and the second set of photographs were taken by a police officer on April 13, 2022. Dkt. No. 39; Exs. 315-317 (April 12 photographs); Exs. 309-314 (April 13 photographs).

32.     Ms. Diaz's account is also consistent with the surveillance videos described above, which show the time period after Mr. Sandoval took her cell phone and the time period after Mr. Sandoval took JASD. The beatings described by Ms. Diaz occurred in the interval between the two videos.

33.     On April 9, 2022, after Mr. Sandoval had beaten Ms. Diaz and threatened to take JASD away, he again returned to his parents' house. At the time, Ms. Diaz was speaking on her cell phone to her uncle, Mr. Marquez. Mr. Sandoval took the cell phone from Ms. Diaz and spoke to Mr. Marquez himself. Dkt. No. 38. Mr. Marquez testified that Mr. Sandoval told him that if Mr. Marquez took Ms. Diaz back to the United States, Mr. Sandoval would kill Mr. Marquez and "five people of [his] family." Dkt. No. 39; *see also* Ex. 48 at 5; Ex. 318 at 12. Mr. Sandoval denied threatening Mr. Marquez. Dkt. No. 39. The Court finds Mr. Marquez's testimony credible.

34.     Later on April 9, 2022, Mr. Sandoval, Ms. Diaz and JASD left for Acapulco. Ms. Diaz testified that Mr. Sandoval did not give her an option to go on the trip to Acapulco or not— he just placed JASD in his vehicle and told Ms. Diaz she had to go with him. Dkt. No. 38.

35.     On the way to Acapulco, Mr. Sandoval and Ms. Diaz stopped at a pharmacy in Mexico City. Ms. Diaz bought medication for the pain and bruising from Mr. Sandoval's beating. While she was in the pharmacy, Mr. Sandoval waited in the vehicle with JASD. Ms. Diaz did not attempt to escape or ask for help at the pharmacy. Ms. Diaz testified that Mr. Sandoval told her that if he saw her do anything strange, he was going to leave with JASD. She also testified that Mr. Sandoval showed her photos taken by some unknown person depicting the outside of her father's house, which she understood as a threat by Mr. Sandoval to harm her father if she did not do as he asked. Dkt. No. 38; Ex. 48 at 5-6; Ex. 318 at 12. Mr. Sandoval acknowledged that they stopped at a pharmacy, but he denied that it was for the purpose of obtaining medication for Ms. Diaz. He also denied using threats or coercion to prevent Ms. Diaz from trying to leave or ask for

United States District Court
Northern District of California

help.  Dkt. No. 39.  The Court finds Ms. Diaz's testimony on this point credible, and finds Mr. Sandoval's contrary testimony not credible.

36.    During the drive to Acapulco, Mr. Sandoval and Ms. Diaz stopped at a gas station and at toll booths operated by the Mexican National Guard.  Ms. Diaz testified that she did not ask for help at any of these stops because Mr. Sandoval had threatened to leave with JASD and because Mr. Sandoval had told her that he had a friend in the federal police who would get him out of trouble.  Dkt. No. 38.  The Court finds Ms. Diaz's testimony about why she did not seek help at a gas station or toll booth credible.

37.    After returning from Acapulco on April 11, 2022, Mr. Sandoval, Ms. Diaz, and JASD travelled to Mr. Sandoval's house in Tecamac.[9]  Dkt. No. 38.  Mr. Sandoval bought Ms. Diaz flowers.  A video, apparently recorded by Mr. Sandoval, shows Ms. Diaz arranging the flowers and speaking to Mr. Sandoval in the Tecamac house, while JASD plays.  Dkt. No. 39; Ex. 10.  Ms. Diaz testified that that night Mr. Sandoval told her to sleep in his bed with him.  Ms. Diaz got into the bed, but told Mr. Sandoval that she did not want him to touch her and that she did not want to have sex with him.  Mr. Sandoval responded by telling her to be quiet and threatened to hit her and wake JASD, who was sleeping in the same room, if she did not comply.  Dkt. No. 38; Ex. 48 at 5; Ex. 308 at 16; Ex. 318 at 12.  It is undisputed that Mr. Sandoval had sex with Ms. Diaz on that night.  Dkt. No. 39; Dkt. No. 40; Ex. 49 at 4.  Mr. Sandoval testified that Ms. Diaz wished to sleep in bed with him and was eager to have sex with him.  Dkt. No. 40.  The Court finds Ms. Diaz's testimony on this point credible, and finds Mr. Sandoval's contrary testimony not credible.

38.    On April 12, 2022, Ms. Diaz took JASD with her to visit an aunt.  Mr. Sandoval did not accompany Ms. Diaz and JASD, but WhatsApp messages Ms. Diaz exchanged with Mr. Sandoval show that Ms. Diaz shared the details of her travel and her real-time location with Mr. Sandoval.  Dkt. No. 39; Ex. 38 at 17-21.  Ms. Diaz testified that she did not call the police while she was with her aunt because Mr. Sandoval had previously threatened her father's safety and because the police had not helped her when she called them from Mr. Sandoval's parent's house

---

[9] Tecamac is a city in the State of Mexico, Mexico.

United States District Court
Northern District of California

1    on April 9, 2022.  Dkt. No. 39.  The Court finds Ms. Diaz's testimony about why she did not seek

2    help while visiting her aunt credible.

3        39.    At some point, Ms. Diaz sent messages to her mother, Juana Ibeth Marquez Garcia,

4    that caused Ms. Marquez to believe that Mr. Sandoval was exerting control over Ms. Diaz and not

5    permitting her to leave.  Ms. Marquez testified that she did not initially act on these messages

6    because Ms. Diaz told her not to.  Ms. Marquez also testified that she had consulted with an

7    attorney, who advised her not to take action until Ms. Diaz returned to Aguascalientes.  Dkt. No.

8    39.

9        40.    On the morning of April 13, 2022, Ms. Marquez went to an office that provided

10   "assistance for women" and then contacted the police.  She reported that Ms. Diaz was being kept

11   against her will by Mr. Sandoval.  At the police station, Ms. Marquez made a written statement

12   accusing Mr. Sandoval of kidnapping Ms. Diaz.  Using location data from Ms. Diaz's cell phone,

13   police officers located Mr. Sandoval, who was driving with Ms. Diaz and JASD, and arrested him.

14   Dkt. No. 39; Ex. 45 (Ms. Marquez's statement); Ex. 47 at 5-8 (statements from arresting officers);

15   Ex. 304 (minute entry from Mr. Sandoval's initial appearance).

16       41.    After Mr. Sandoval was arrested, police officers took Ms. Diaz and JASD to

17   another location to collect evidence.  There, Ms. Diaz made a written statement, and the police

18   documented her injuries.  Ex. 48 (Ms. Diaz's statement); Ex. 49 (gynecological exam report); Ex.

19   51 (injury report); Exs. 309-314 (photographs of injuries).  Ms. Diaz's testimony at trial about the

20   events of April 9-13, 2022 is consistent with the statement she gave to the police in all material

21   respects.

22       42.    Police officers also examined JASD for physical or psychological injuries, but

23   found none.  Dkt. No. 39 *see also* Ex. 50-A (photograph of JASD taken on April 13, 2022).

24       43.    The Aguascalientes state prosecutor charged Mr. Sandoval with the crime of

25   "deprivation of liberty."  On April 16, 2022, Mr. Sandoval made an initial appearance before a

26   judge who released him from custody on conditions including an order that he refrain from

27   contacting Ms. Diaz.  Ex. 304 (minute entry).

28       44.    On August 4, 2022, the court presiding over Mr. Sandoval's criminal case

United States District Court
Northern District of California

conditionally suspended the prosecution. The court required Mr. Sandoval, for a period of six

months, to reside at a specific address, stay away from Ms. Diaz and refrain from contacting her

electronically, receive treatment from a psychologist, and provide his signature or fingerprints to

law enforcement every two months. Ex. 307. In addition, the court required Mr. Sandoval to pay

Ms. Diaz 84,000 pesos so that she could obtain psychological therapy. Dkt. No. 38; Dkt. No. 39;

Ex. 307.

45.     On March 27, 2023, the court determined Mr. Sandoval had complied with the

conditions it had set and dismissed the criminal case against him. Dkt. No. 39; Ex. 77. A final

order of dismissal was entered on May 4, 2023. Ex. 37. Mr. Sandoval did not admit that he

committed any crime, nor was he ever convicted of a crime. Dkt. No. 39; Ex. 41.

## III.    CONCLUSIONS OF LAW

### A.    Petitioner's Case for Return under Article 3

The "core premise" of the Hague Convention is that "'the interests of children . . . in

matters relating to their custody' are best served when custody decisions are made in the child's

country of 'habitual residence.'" *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) (quoting Hague

Convention preamble). "To that end, the Convention ordinarily requires the prompt return of a

child wrongfully removed or retained away from the country in which she habitually resides." *Id.*

The United States and Mexico are parties to the Hague Convention. *Valenzuela v. Michel*, 736

F.3d 1173, 1176 (9th Cir. 2013).

In the United States, ICARA allows a parent seeking relief under the Hague Convention to

file a petition for return of a child in state or federal court, where it will be decided "in accordance

with the Convention." 22 U.S.C. § 9003(d). Courts are empowered "to determine only rights

under the Convention and not the merits of any underlying child custody claims." *Id.* §

9001(b)(4); *see also* Hague Convention, Art. 19.

Mr. Sandoval petitions for the return of JASD pursuant to Article 3 of the Hague

Convention. He must establish by a preponderance of the evidence that JASD was wrongfully

removed or retrained from his country of habitual residence. 22 U.S.C. § 9001(e)(1). A removal

is "wrongful" when it is "in breach of rights of custody attributed to a person . . . under the law of

the State in which the child was habitually resident immediately before the removal or retention" and "at the time of removal or retention those rights were actually exercised . . . or would have been so exercised but for the removal or retention." Hague Convention, Art. 3. As noted above, Mr. Sandoval has established the elements of his case for return of JASD. Thus, JASD must be returned to Mexico unless Ms. Diaz establishes a defense to return.

### B.       Respondent's Defenses to Return under Articles 12 and 13(b)

The Hague Convention recognizes six exceptions or defenses that may be raised against a petition for return of a child. Hague Convention, Arts. 12, 13. These defenses are interpreted narrowly. *Asvesta v. Petroutsas*, 580 F.3d 1000, 1004 (9th Cir. 2009). Even if a defense is established, a court retains discretion to order a child's return. Hague Convention, Art. 18; *Asvesta*, 580 F.3d at 1004.

### 1.       Article 12

Article 12 provides that when proceedings for return of a child "have been commenced after the expiration of the period of one year" from the child's removal, the court "shall . . . order the return of the child, unless it is demonstrated that the child is now settled in its new environment." Hague Convention, Art. 12. "Commencement of proceedings" means the initiation of "judicial proceedings" by filing a petition in a court of appropriate jurisdiction. 22 U.S.C. §§ 9003(b), (f)(3); *see also Monzon v. De La Roca*, 910 F.3d 92, 98-99 (3d Cir. 2018) (holding that notice filed with central authority in child's country of habitual residence did not constitute "commencement of proceedings"). To establish a defense under Article 12, Ms. Diaz must prove by a preponderance of the evidence that JASD is now settled in California. 22 U.S.C. § 9003(e)(2)(B).

Here, Mr. Sandoval filed his petition initiating this action on October 6, 2023, more than one year after JASD's removal on April 21, 2022. Dkt. No. 1; Dkt. No. 33 at 2. Ms. Diaz contends that JASD is now settled in California and should not be returned to Mexico for that reason. Mr. Sandoval did not present any evidence that JASD is not settled in the United States, and he did not dispute the evidence Ms. Diaz presented. Rather, he challenges whether Ms. Diaz's evidence is sufficient to establish the defense.

United States District Court
Northern District of California

United States District Court
Northern District of California

The Ninth Circuit has identified several factors "bear[ing] on whether the child has significant connections to the new country" to aid courts in determining whether a child is "settled." *In re B. Del C.S.B.*, 559 F.3d 999, 1009 (9th Cir. 2009).[10]  They include:  "(1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability." *Id.*  "Ordinarily the most important [factor] is the length and stability of the child's residence in the new environment." *Id.*  "[T]he immigration status of the child and the respondent" may also be relevant, but generally this is only the case "if there is an immediate, concrete threat of deportation." *Id.*  The Court considers each of these factors.

*Age.*  JASD, who was born in May of 2018, was nearly four years old when Ms. Diaz removed him to the United States in April of 2022.  Mr. Sandoval filed his petition nearly 18 months later, in October of 2023, when JASD was about five-and-one-half years old.  Some courts have expressed doubt that very young children can form sufficient connections with a new country to become settled.  *See, e.g.*, *Riley v. Gooch*, No. 09-cv-1019-PA, 2010 WL 373993, at *10-11 (D. Or. Jan. 29, 2010) (two-year-old child too young to be settled).  However, a child of JASD's age is capable of forming connections and relationships with extended family, other children, teachers and others in the community, as JASD has done here.  Courts regularly find that five-year-old children are capable of being settled.  *See, e.g.*, *Margain v. Ruiz-Bours*, No. 13-cv-01162-TUC, 2014 WL 10987427, at *6 (D. Ariz. Jan. 22, 2014), *aff'd*, 592 F. App'x 619 (9th Cir. 2015) (five-year-old child settled); *Garza-Castillo v. Guajardo-Ochoa*, No. 2:10-cv-00359-LDG, 2012 WL 523696, at *5 (D. Nev. Feb. 15, 2012) (child who was four years old when petition was filed and five-and-one-half years old at time of decision was settled); *In re Lozano*, 809 F. Supp. 2d 197, 231 (S.D.N.Y. 2011), *aff'd sub nom. Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014) (child who

---

[10] Other circuits employ the same or similar factors.  *See, e.g.*, *Lops v. Lops*, 140 F.3d 927, 946 (11th Cir. 1998); *Lozano v. Alvarez*, 697 F.3d 41, 57 (2d Cir. 2012); *Hernandez v. Garcia Pena*, 820 F.3d 782, 787 (5th Cir. 2016); *Alcala v. Hernandez*, 826 F.3d 161, 171 (4th Cir. 2016).

was five years old when petition was filed was settled).

This factor weighs modestly in Ms. Diaz's favor.

*Duration and stability of residence.* Nearly 18 months elapsed between JASD's removal from Mexico and the date Mr. Sandoval filed his petition in this action. JASD has been continuously present in California during that time. In addition, before arriving in Watsonville on April 21, 2022, JASD spent several months with his mother in the same community between December 2021 and early April 2022. Other courts have found children settled after similar periods of residence in a new country. *See, e.g.*, *In re Lozano*, 809 F. Supp. 2d at 230-31 (16 months duration, which the court described as "a long period of time in the life of a five-year-old"); *Margain*, 2014 WL 10987427, at *6 (18 months' duration); *Cascio v. Pace*, 992 F. Supp. 2d 856, 869 (N.D. Ill. 2014) (17 months' duration).

JASD has lived in Watsonville, California for the entirety of his time in the United States. Ms. Diaz and JASD initially lived with her uncle, Mr. Marquez, at his home, but after about a year, they moved into their own home, which they share with Ms. Diaz's brother. This move suggests an increased level of stability in JASD's residence. *See Garza-Castillo*, 2012 WL 523696, at *6; *cf. Bernal v. Gonzalez*, 923 F. Supp. 2d 907, 926-28 (W.D. Tex. 2012) (finding that children's "frequent moves and lack of relatives" raised "serious doubts as to the stability of the new environment").

JASD has lived in a stable home environment in the same community in Watsonville for 21 months as of the date of this order. The Court finds that this factor weighs in Ms. Diaz's favor.

*School and day care.* JASD began attending a local Head Start program shortly after arriving in the United States and graduated in May of 2023. He enrolled in kindergarten at the beginning of the 2023-2024 school year. His attendance has been nearly perfect, and he is doing well in school. *See In re Lozano*, 809 F. Supp. 2d at 231 (child was enrolled in kindergarten and had attended pre-kindergarten the previous school year).

This factor weighs in Ms. Diaz's favor.

*Friends and relatives.* JASD has a large extended family in the Watsonville area with whom he and Ms. Diaz interact on a regular basis. JASD has also made friends in school. *See*

United States District Court
Northern District of California

*Garza-Castillo*, 2012 WL 523696, at *5-6 (observing that child had approximately 50 extended relatives in area and regularly saw them); *Margain*, 2014 WL 10987427, at *6 (noting that child had "developed friendships with other children").

      This factor weighs in Ms. Diaz's favor.

      *Community and extracurricular activities*.  Aside from family-related activities, the only community or extracurricular activities in which JASD has participated are attending church and taking swim lessons.  JASD's limited engagement in such activities is consistent with his age. However, the evidence regarding this factor is not particularly compelling.

      The Court finds that this factor is neutral.

      *Respondent's employment and financial stability.*  Ms. Diaz has been continuously employed full-time since arriving in California.  She is able to support herself and JASD without assistance.  There is no indication that Ms. Diaz has been unable to provide for JASD.

      This factor weighs in favor of Ms. Diaz.

      *Immigration status and risk of deportation.*  Ms. Diaz has applied for asylum in the United States, with JASD as a derivative beneficiary.  While the application has not been adjudicated, there is no indication that Ms. Diaz or JASD face an "immediate, concrete threat of deportation." *In re B. Del C.S.B.*, 559 F.3d at 1009.  The Court finds that JASD's immigration status does not weigh against a conclusion that he is settled.  *See Etienne v. Zuniga*, No. C10-5061BHS, 2010 WL 4918791, at *2-3 (W.D. Wash. Nov. 24, 2010) (finding child with pending asylum application settled).

* * *

      Considering all of the factors described by the Ninth Circuit *In re B. Del C.S.B.*, and particularly the duration and stability of JASD's residence in Watsonville, California, the Court concludes that JASD is now settled in the United States.  All but one of the factors weighs in favor of this conclusion.  One factor—JASD's participation in community and extracurricular activities—is neutral.  No factor weighs against a finding that JASD is settled.

### 2.     Article 13(b)

      Article 13(b) provides that a court "is not bound to order the return of the child" if the

United States District Court
Northern District of California

party opposing return establishes that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Art. 13(b).  Even if a court finds that a grave risk of harm exists, it may still order the child's return with ameliorative measures that would "allow both the return of the child[] to [his] home country and [his] protection from harm."  *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005), *abrogated on other grounds by Golan v. Saada*, 596 U.S. 666, 676 n.6 (2022).

"The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest."  *Id.* at 1035 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996)) (cleaned up); *Cuellar v. Joyce*, 596 F.3d 505, 509 (9th Cir. 2010) (quoting *Asvesta*, 580 F.3d at 1020) ("So as not to impair the Convention's general policy, [the grave risk] exception is 'narrowly drawn.'").  "Rather, the question is whether the child would suffer 'serious abuse, that is 'a great deal more than minimal.'"  *Gaudin*, 415 F.3d at 1035 (quoting *Blondin v. Dubois*, 238 F.3d 153, 163 n.11 (2d Cir. 2001) and *Walsh v. Walsh,* 221 F.3d 204, 218 (1st Cir. 2000)) (cleaned up).

"A respondent parent can establish a grave risk of harm from abuse 'where the petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question.'"  *Colchester v. Lazaro*, 16 F.4th 712, 717-18 (9th Cir. 2021) (quoting *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014)).  Domestic violence committed by one parent against the other may also establish a grave risk of harm to the child, particularly when the violence occurs in the presence of the child.  *Id.*; *see also Golan*, 596 U.S. at 680 ("[D]omestic violence in the home may also constitute an obvious grave risk to the child's safety that could not readily be ameliorated.").  In determining whether domestic violence between parents creates a grave risk of harm, "the proper inquiry focuses on the risk faced by the child, not the parent."  *Gomez v. Fuenmayor*, 812 F.3d 1005, 1010 (11th Cir. 2016).

As the party arguing that return to Mexico would expose JASD to a grave risk of harm, Ms. Diaz must establish that this defense applies by clear and convincing evidence.  22 U.S.C. § 9003(e)(2)(A).

Here, Ms. Diaz contends that Mr. Sandoval has harmed JASD by engaging in acts of

1   domestic violence against Ms. Diaz, some of which occurred in JASD's presence, and by

2   threatening Ms. Diaz and her family.  As the Court finds above, Ms. Diaz has established that Mr.

3   Sandoval abused her physically and emotionally on several occasions and threatened Ms. Diaz and

4   her family members as a means of exerting control over Ms. Diaz.  Mr. Sandoval did not

5   physically abuse JASD at any time.

6        Ms. Diaz has not established by clear and convincing evidence that if JASD is returned to

7   Mexico there is a grave risk that he will be exposed to physical harm by Mr. Sandoval.  However,

8   Ms. Diaz has established by clear and convincing evidence that if JASD is returned to Mexico

9   there is a grave risk that he will be exposed to psychological harm.

10        JASD witnessed Mr. Sandoval beat his mother in front of him and heard Mr. Sandoval say

11   that JASD would never see his mother again.  Indeed, Mr. Sandoval has repeatedly threatened to

12   take JASD away from his mother.  *See Khan v. Fatima*, 680 F.3d 781, 787 (7th Cir. 2012)

13   ("[R]epeated physical and psychological abuse of a child's mother by the child's father, in the

14   presence of the child (especially a very young child, as in this case), is likely to create a risk of

15   psychological harm to the child.").  Mr. Sandoval has also threatened JASD's relatives—Ms.

16   Diaz's family—with violence to coerce their behavior and Ms. Diaz's.  *See Acosta v. Acosta*, 725

17   F.3d 868, 875-76 (8th Cir. 2013) (finding a grave risk when petitioner had a "violent temper and

18   inability to cope with the prospect of losing custody of [his] children" and had "made multiple

19   threats to kill [respondent] and her family").  And Mr. Sandoval, while intoxicated, has spoken of

20   killing himself, and has even gone through the motions of hanging himself, with JASD present.

21   *See Braude v. Zierler*, No. 22 CV 03586 (NSR), 2022 WL 3018175, at *8 (S.D.N.Y. July 29,

22   2022), *aff'd*, No. 22-1985, 2023 WL 3012269 (2d Cir. Apr. 20, 2023) (finding a grave risk when

23   petitioner had a "concerning history of angry and manipulative behavior," including threats of

24   suicide).  These are not isolated incidents of abuse aimed at someone other than JASD.  Rather,

25   they represent a pattern of physical and emotional abuse of JASD's mother, in JASD's presence.

26   In short, JASD has already been placed at risk of psychological harm.  It is likely that JASD will

27   again be exposed to this risk if he is if returned to Mexico.

28        The Court concludes that Ms. Diaz has established by clear and convincing evidence that

United States District Court
Northern District of California

18

there is a grave risk that returning JASD to Mexico would expose him to psychological harm.

### C.    The Court's Authority to Exercise Discretion

Even though Ms. Diaz has established defenses under both Article 12 and Article 13(b), the Court retains discretion to order JASD's return to Mexico.  Hague Convention, Art. 18; *Asvesta*, 580 F.3d at 1004.

With respect to the Article 12 defense, the Court may consider "interests of the child and the non-abducting parent."  *Lozano*, 572 U.S. at 19 (Alito, J., concurring).  For example, the Court may consider JASD's interest in returning to Mexico, including his need for contact with his father and other family members.  *Id.* at 20.  In addition, the Court may also consider whether Ms. Diaz engaged in inequitable conduct, such as concealing JASD's location from Mr. Sandoval in order to hinder his efforts to petition for JASD's return.  *Id.*

The Court does not question that Mr. Sandoval has an interest in contact with JASD, and that JASD likewise has an interest in contact with Mr. Sandoval and with other family members in Mexico.  However, these interests do not outweigh the factors that the Court has already considered in its determination that JASD is now settled in California.  In addition, there is no evidence that Ms. Diaz concealed JASD from Mr. Sandoval.  *See Garza-Castillo*, 2012 WL 523696, at *4 (finding no concealment when "[petitioner] was not only well aware of [respondent's] connections to Las Vegas (where she was raised and has numerous relatives) but that he was aware of the addresses of [respondent's] relatives in Las Vegas"); *Edoho v. Edoho*, Civ. A. No. H-10-1881, 2010 WL 3257480, at *7 (S.D. Tex. Aug. 17, 2010) ("[Respondent] made no effort to conceal the children.  While she did not inform [petitioner] of her whereabouts, she went to live openly with a known relative, she did not change her name or the children's names, and she enrolled [one child] in school."); *see also In re B. Del C.S.B.*, 559 F.3d at 1014-15.  The Court notes that Mr. Sandoval has initiated custody-related proceedings in family court in Mexico, and Ms. Diaz has refused to participate in those proceedings.  Ms. Diaz's refusal to return to Mexico and to participate in custody proceedings there is not the kind of inequitable conduct that warrants the return of a child who is settled in a new environment.  *See Margain*, 2014 WL 10987427, at *3 (noting that respondent's custody rights were revoked by a Mexican family court,

but declining to return settled child), *aff'd*, 592 F. App'x at 621 (finding "no equitable factors counsel against application of the Article 12 exception").

With respect to the Article 13(b) defense, the Court may consider whether ameliorative measures could ensure JASD's safe return to Mexico. *Golan*, 596 U.S. at 679. "The fact that a court may consider ameliorative measures concurrent with the grave-risk determination, however, does not mean that the Convention imposes a categorical requirement on a court to consider any or all ameliorative measures before denying return once it finds that a grave risk exists." *Id.* at 677-78. "[A]ny consideration of ameliorative measures must prioritize the child's physical and psychological safety. . . . A court may therefore decline to consider imposing ameliorative measures where it is clear that they would not work because the risk is so grave." *Id.* at 680. "[D]omestic violence in the home may . . . constitute an obvious grave risk to the child's safety that could not readily be ameliorated." *Id.* Moreover, a court has "has no obligation under the Convention to consider ameliorative measures that have not been raised by the parties." *Id.* at 679.

At the Court's invitation, Mr. Sandoval filed a document describing "proposed ameliorative measures." Dkt. No. 35. However, his proposal merely calls for JASD to be returned to Mexico and for the parties to submit their dispute to the Mexican family court. *See id.* This proposal does not address the Court's concern that there is a grave risk that JASD will be exposed to psychological harm if returned to Mexico. *See Golan*, 596 U.S. at 680. Because the parties have not proposed any ameliorative measures addressing this concern, and because further proceedings concerning such measures would unnecessarily prolong these proceedings, the Court declines to exercise its discretion to impose ameliorative measures. *Id.* at 682 ("[A] district court reasonably may decline to consider ameliorative measures that have not been raised by the parties, are unworkable, draw the court into determinations properly resolved in custodial proceedings, or risk overly prolonging return proceedings.").

## IV.    CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Court concludes that while Mr. Sandoval has established his case for return of JASD under Article 3 of the Hague

1  Convention, Ms. Diaz has established two defenses to the petition for return:  (1) JASD is settled

2  in California, as provided in Article 12, and (2) there is a grave risk that JASD would be exposed

3  to psychological harm if he were returned to Mexico, as provided in Article 13(b).

4       The Court therefore denies Mr. Sandoval's petition.

5       **IT IS SO ORDERED.**

6  Dated: February 9, 2024

7

8                        _____

9                        VIRGINIA K. DEMARCHI
                      United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California